J-S20016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| THOMAS BISIGNANI | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SANDRA BISIGNANI | : | |
| | : | |
| Appellant | : | No. 993 MDA 2024 |

Appeal from the Order Entered June 13, 2024
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s): 2018 FC 40576

| | | |
|---|---|---|
| THOMAS BISIGNANI | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| SANDRA BISIGNANI | : | No. 1022 MDA 2024 |

Appeal from the Order Entered June 13, 2024
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s): 2018 FC 40576

BEFORE: OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.: **FILED: AUGUST 5, 2025**

In these cross-appeals, Thomas Bisignani ("Husband") appeals from the

June 13, 2024 order[1] granting his petition to modify his alimony payments to

---

[1] On August 6, 2024, subsequent to the filing of the parties' notices of appeal, the trial court entered an order purporting to vacate its June 13, 2024 order but otherwise maintaining the relief set forth in the June 13, 2024 order. On August 9, 2024, the trial court filed a second amended, but nearly identical
*(Footnote Continued Next Page)*

Sandra Bisignani ("Wife") and Wife's petition to hold Husband in contempt of the parties' marital settlement agreement ("MSA"). Wife appeals from the June 13, 2024 order to the extent it granted Husband's petition to modify. We affirm in part and vacate in part.

Husband and Wife married in 1991. In 2018, Husband filed a petition for divorce. The parties executed the MSA in May 2020, and they filed the agreement in the trial court on June 12, 2020. On June 25, 2020, the court entered a final divorce decree, which incorporated the MSA.

We quote the relevant portions of the MSA:

**1.16 REMEDIES AND SANCTIONS**

In addition to such other remedies and sanctions available under law, the parties may utilize any remedy or sanction set forth

_____

order, which purported to vacate its August 6, 2024 order. The parties filed a stipulation in this Court providing that the August 9, 2024 order shall be the final order for purposes of this appeal.

However, because the trial court entered the orders of August 6 and 9, 2024 after the filing of the notices of appeal, these orders are legal nullities. **See** Pa.R.A.P. 1701(a) (providing that, with limited exceptions not relevant here, "after an appeal is taken . . . the trial court . . . may no longer proceed further in the matter"); **see also** 42 Pa.C.S. § 5505 (stating that a court "may modify or rescind any order within 30 days after its entry, notwithstanding the prior termination of any term of court, if no appeal from such order has been taken or allowed"). Trial courts retain authority to correct "patent or obvious" mistakes in an order following the filing of a notice of appeal. **Manufacturers & Traders Tr. Co. v. Greenville Gastroenterology, SC**, 108 A.3d 913, 921 (Pa. Super. 2015). While the August 2024 orders purported to only correct a technical mistake by indicating that the court considered the testimony and evidence presented at the March 25 and April 12, 2024 hearings, the orders also altered the effective date for the reduction of alimony. Accordingly, we do not consider the August 2024 orders, and we instead treat the June 13, 2024 order as the final order for the purpose of this appeal.

in the Pennsylvania Divorce Code of 1980, as amended [("Divorce Code")],[2] to enforce any term of this agreement as though it had been an order of court.

\* \* \* \*

## 2.4 RETIREMENT BENEFITS/401(K)/IRA

It is hereby agreed that Husband shall transfer to Wife the balance of his Mercy Partners Retirement Account [("Pension Plan" or "Plan")]. The parties shall execute a qualified domestic relations order (["]QDRO["]) to be prepared by counsel for Wife, and any other documentation necessary authorizing such to occur.

\* \* \* \*

The parties further acknowledge and agree they shall execute any documents . . . that may be required from time to time to accomplish the purpose of this paragraph. . . .

## 2.5 INVESTEMENTS/BANK ACCOUNTS

It is agreed that Husband shall transfer to Wife the E*Trade/ShareBuilders account [("E*Trade Account")] and such shall become her sole and exclusive property.

\* \* \* \*

## 3 SPOUSAL SUPPORT/ALIMONY/ALIMONY PENDENTE LITE

It is acknowledged that there is currently a spousal support order through the Domestic Relations Office of Lackawanna County. It is agreed that said spousal support order shall convert to an alimony order in the amount of $4,000.00 per month effective the first day of the month subsequent to the entry of a divorce decree. Said amount shall continue to be paid until Wife reaches the age of sixty-two (62) years and begins to receive or is eligible to receive her Social Security benefits. At that time, the alimony payment shall be reduced by the amount Wife is to receive in Social Security benefits. The modified alimony payment shall continue to be paid until Wife reaches the age of sixty-six (66) years.

---

[2] **See** 23 Pa.C.S.A. §§ 3101-3904.

It is agreed that said alimony payments shall be subject to modification if Husband has a substantial change in his salary and/or his economic position provided such is not caused by his own actions.

**4 SECURITY AND GUARANTEE OF PAYMENTS**

It is hereby agreed herein that Husband shall secure and guarantee his required payments of alimony as set forth in paragraph 3 as follows:

Husband shall maintain a life insurance policy in an amount sufficient to pay the total amount of alimony to Wife should he predecease her. As of the date of the execution of this agreement, Husband presently has a life insurance policy in the amount of sufficient [*sic*] to meet his full alimony obligation in which Wife is an existing beneficiary. Wife shall remain as an existing beneficiary to the extent of the terms and conditions of this agreement wherein it is for the purpose of guaranteeing the total amount of alimony that would be paid to Wife over the period of time as set forth in this agreement. Husband shall provide proof to Wife on an annual basis that she shall remain as an irrevocable beneficiary on said policy to the extent of this agreement until such time as the alimony is paid in full. Husband shall only be required to insure Wife up to the amount remaining due in total and shall reduce coverage on a yearly basis as the alimony is paid. . . .

Should Husband not have life insurance at his place of employment he shall be obligated to maintain a separate policy for the benefit of Wife in order to guarantee the alimony payments as contained herein. Husband shall provide proof to Wife on an annual basis that she shall remain as an irrevocable beneficiary on said policy to the extent of this agreement until such time as the alimony is paid in full.

MSA, 6/12/20, at ¶¶ 1.16, 2.4, 2.5, 3, 4 (unnecessary capitalization omitted).

At the time the parties entered into the MSA, Husband was employed as the Chief Financial Officer ("CFO") at the Regional Hospital of Scranton ("Hospital"). In 2019, Husband earned $330,543.44 in compensation from

the Hospital. The Hospital terminated Husband's employment in April 2023 with severance of $183,600 paid over nine months. In June 2023, Husband obtained employment as the CFO and Chief Operating Officer for the Moses Taylor Foundation ("Foundation"), at an annual salary of $217,500.

On December 19, 2023, Husband filed his petition to modify his alimony payments. Husband requested a 50% reduction in his alimony payments based upon the alleged 34% reduction in his salary from his 2019 earnings at the Hospital to his salary at the Foundation, as well as "deteriorat[ing]" economic conditions, "including interest-rate increases and excessive inflation." Petition to Modify Alimony, 12/19/23, at ¶ 16. Beginning in February 2024 — the month after Husband's last severance payment from the Hospital — Husband reduced his monthly alimony payment to Wife to $2,000 and paid the remaining $2,000 into an account held in escrow by his attorney.

On January 24, 2024, Wife filed a petition for contempt, in which she alleged that Husband was in violation of Paragraphs 2.4, 2.5, and 4 of the MSA based upon his failure to: (1) transfer the balance of the Pension Plan to Wife; (2) transfer the joint E*Trade Account to her sole property; and (3) provide proof that he maintained a life insurance policy sufficient to guarantee future alimony payments.

The trial court conducted hearings on the petitions on March 25 and April 12, 2024. The trial court summarized the testimony adduced at the hearings:

> At the March 25, 2024, hearing, [Husband] called an economist, Professor Iordanis Petsas [("Professor Petsas")] from the University of Scranton as an expert witness [in the field of

macroeconomics and international economics]. Professor Petsas opined that currently there is an aggregate inflation rate of 16.73 percent across three areas, housing, utilities, and food. Professor Petsas opined that [Husband] did endure a substantial salary reduction. Professor Petsas indicated he did not consider [Husband's] expenses in 2020 compared to 2023, only the tax returns provided. Additionally, he stated that the aggregate inflation rate would also affect lower income earners. Finally, Professor Petsas concluded that he did not consider the statutory alimony factors when determining his opinion.

At the April 14, 2024, hearing, both [Husband] and [Wife] testified.

First, [Husband] was called to testify and summarized his obligations under the [MSA] as well as his monthly and day to day expenses. [Husband] testified that he believed he executed the necessary paperwork regarding the . . . QDRO[] and that he had no other obligation. Additionally, [Husband] testified that he signed the relevant paperwork to remove his name from the E*Trade [A]ccount and that he is unaware of any responsibilities related to that account. [Husband] testified his only income is salary he receives from [the] Hospital . . . and the . . . Foundation and a[n i]nvestment account. [Husband's] 2023 tax return . . . shows that [he] earned $266,246.85 [from the Hospital]. Within this amount is a severance pay of $183,600. Additionally, the W-2 for 2023 from [the Foundation] shows [Husband] earned $106,932.53 for working from June to December [2023, based off his annualized salary of $217,500. Husband earned $330,543.44 in compensation from the Hospital in 2019, $294,352 in 2020, and $365,735.41 in 2022. Husband explained that his compensation from the Hospital "vacillated" considerably from year-to-year based upon cost-of-living adjustments and bonuses. N.T., 4/12/24, at 38. His employment contract with the Foundation does not include cost-of-living adjustments or bonuses.]

[Husband] listed a number of daily and monthly expenses that included utilities, gas, food, car purchases and lease, cell phone bills, student loans for his new spouse, [his] stepdaughter's college rent, and other loans. [Husband] testified that at the time of the [MSA] he was able to afford his expenses plus the alimony payment, however now he is unable to afford it all and has had to make cuts. He additionally testified that some of the items listed on his expense sheets were duplicates that were encompassed in other itemized amounts. He also agreed that some of the bills he

is currently paying are voluntary such as his stepdaughter[']s college rent and wife's tuition.

[Husband] also testified he agreed, pursuant to the [MSA], that he was to maintain a life insurance policy that secured the alimony payments until [Wife] reached age [sixty-six. Wife was fifty-seven as of the date of the hearing.] He testified that the [original] life insurance policy [that guaranteed the alimony payments] no longer exists. He testified he currently has a $100,000.00 life insurance policy through his new employer, and he listed [Wife] as his beneficiary and presented it to the parties the day of the hearing. He agreed this was not sufficient to cover the terms as outlined in the [MSA. Husband] testified that when considering the modification of the alimony payment, a $100,000.00 life insurance policy would still not be sufficient according to the terms of the [MSA] because even a reduction by half would still need coverage in the amount of $240,000.00 to satisfy the life of the alimony payments.

[Husband] later testified that the[] bills [he described during his testimony] are required for his day to day living and with his [approximately] 35% reduction in salary he cannot afford his daily expenses. [Husband] also testified he did not include his new spouse's income when determining the monthly expenses.

[Husband] testified that he pays $2,000.00 a month to his attorney to hold in escrow . . . and $2,000.00 a month to [the D]omestic [R]elations [Office] for [Wife] as alimony since [February 2024].

[Wife] was next called to testify. [Wife] testified that pursuant to the [MSA], she currently resides in the marital home in which she refinanced the mortgage and now has a mortgage payment. At the time of the divorce, [Wife] testified that her salary was $27,300.00 [through her employment as an operating room coordinator at the Hospital. Currently, [Wife] testified that her wages have increased, and she makes $31,267.00 [in her current role as a centralized scheduler at the Hospital. Wife] testified that she relies on the alimony payments. [Wife] testified that her net monthly income is $2,058.16. [Wife] testified that considering her monthly expenses she could not afford them without the $4,000.00 alimony payment. Additionally, [Wife] testified that both food and gas bills have increased since the time of the [MSA] and it has made it harder to maintain her expenses.

Additionally, [Wife] testified that as of the date of the hearing, April 12, 2024, E*Trade still had both [Husband] and [Wife] listed on the account, and she is still unable to trade or cash out. [Wife] testified that [Husband] submitted a letter to her but did not submit the letter to E*Trade.

Trial Court Opinion, 9/10/24, at 4-7 (record citations omitted).

Following the submission of additional briefing, the trial court entered an order on June 13, 2024, granting Husband's petition to modify his alimony payments. In calculating Husband's new alimony payments, the court compared his 2022 Hospital income of $365,735.41 with his 2023 Hospital income of $266,346.85,[3] which reflected a reduction of $99,388.76 from 2023 to 2022, or 27.3%. The court accordingly reduced Husband's alimony payments by 27.3%, from $4,000 to $2,908, effective from the date of the order.

In its order, the trial court also granted Wife's contempt petition and imposed a suspended sentence of six months' incarceration and a $1,000 fine. The court established the following conditions for Husband to purge himself of contempt: (1) transfer the Pension Plan to Wife within thirty days of the date of the order; (2) "complete the signature form of the E*Trade [A]ccount in order for its successful transfer" within thirty days of the date of the order; (3) "maintain a life insurance policy as agreed" in Paragraph 4 of the MSA within sixty days of the date of the order; and (4) release all alimony funds

_____

[3] As discussed below, the trial court did not consider Husband's 2023 income from the Foundation when calculating the reduction of his salary.

- 8 -

held in escrow as the modification was only made prospective from the date of the order. Order, 6/13/24, at 3-4 (unnumbered).

Both Husband and Wife filed timely notices of appeal. The parties and the trial court have complied with Pa.R.A.P. 1925. This Court consolidated the appeals and designated Husband as appellant/cross-appellee.

Husband presents the following issues for our review:

1. Whether and to what extent the trial court, in issuing its order granting Husband's petition to modify and reduce alimony order, committed error or otherwise abused its discretion when incorrectly calculating Husband's reduction in monthly alimony payments to be 27.3% — a calculation based on insufficient evidence — and refusing to apply those reductions retroactively to the date of filing?

2. Whether the trial court's order granting Wife's petition for compliance and contempt by finding Husband in contempt of the [MSA] and imposing sanctions based on the record of evidence and sworn testimony was manifestly unreasonable as there is insufficient evidence to impute wrongful intent or establish with substantial certainty that Husband's conduct would violate the consent order?

Husband's Brief at 6 (unnecessary capitalization and suggested answers omitted).

Wife presents the following issues for our review:

1. Whether the trial court committed an error of law and/or an abuse of discretion when it determined that the alimony payments should be reduced by 27.3% to $2,908 per month even though his 2023 salary increased and did not substantially decrease?

2. Whether the trial court committed an error of law and/or an abuse of discretion by finding a substantial change in Husband's economic position even though any change was the direct result of his own actions in choosing to pay expenses and

- 9 -

debt of third parties, specifically those of his new wife and her children, which he was not required or legally obligated to pay and contributed to his inability to make the required alimony payment?

3. Whether the trial court committed an error of law and/or abuse of discretion by considering Husband's claimed reduction in income by comparing his salary from 2022 and 2023 as the basis for the reduction of alimony?

Wife's Brief at 5 (suggested answers and statement of preservation omitted).

We first address the parties' arguments concerning the grant of Husband's petition to modify alimony. "We begin our discussion by recognizing that the principles governing contractual agreements are different from those governing court-ordered awards. Because the instant support obligation arose from an agreement, rather than a court-ordered award, this matter is governed by contract law." *Long v. Long*, 282 A.3d 694, 698 (Pa. Super. 2022).

> When interpreting a marital settlement agreement, the trial court is the sole determiner of facts and absent an abuse of discretion, we will not usurp the trial court's fact-finding function. On appeal from an order interpreting a marital settlement agreement, we must decide whether the trial court committed an error of law or abused its discretion.
>
> Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. However, we are bound by the trial court's credibility determinations.

*Rosiecki v. Rosiecki*, 231 A.3d 928, 933 (Pa. Super. 2020) (citation omitted). An abuse of discretion "is not merely an error of judgment. But if,

in reaching a conclusion, law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or lacking in reason, discretion must be held to have been abused." *Stamerro v. Stamerro*, 889 A.2d 1251, 1257 (Pa. Super. 2005) (citation omitted).

Under contract law principles, our goal in interpreting an agreement is to ascertain the intent of the parties:

> In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.

*Long*, 282 A.3d at 698 (citation omitted). Moreover,

> [t]he court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement. The court will adopt an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement.

*Stamerro*, 889 A.2d at 1258 (citation omitted).

"[T]he purpose of alimony is not to reward one party and to punish the other, but rather to ensure that the reasonable needs of the person who is unable to support himself or herself through appropriate employment, are met." *Conner v. Conner*, 217 A.3d 301, 315 (Pa. Super. 2019) (citation omitted). "Alimony is generally based upon reasonable needs in accordance

- 11 -

with the parties' standard of living established during the marriage, and the payor's ability to pay." ***Stamerro***, 889 A.2d at 1259.

In her first and second issues, Wife challenges the trial court's determination that Husband sustained a reduction in his salary or economic position meriting modification of his alimony payments. Pursuant to the Divorce Code, a trial court shall not modify an alimony award established in a settlement agreement absent "a specific provision to the contrary appearing in the agreement." 23 Pa.C.S.A. § 3105(c). As noted above, the MSA expressly provides that the parties may utilize any remedy set forth in the Divorce Code to enforce any term of the agreement. ***See*** MSA, 6/12/20, at ¶ 1.16.

Section 3701(e) of the Divorce Code authorizes a trial court to modify an alimony order "upon changed circumstances of either party of a substantial and continuing nature." 23 Pa.C.S.A. § 3701(e). Notwithstanding this language of Section 3701(e) governing the modification of court-ordered alimony, we apply the standard set forth in the MSA to assess whether the trial court properly modified Husband's alimony. ***See Kripp v. Kripp***, 849 A.2d 1159, 1165 (Pa. 2004) (holding that this Court erred by considering Divorce Code definition of cohabitation in determining whether to terminate alimony when the parties' private agreement did not incorporate statutory definition); ***see also Long***, 282 A.3d at 702 (observing that "[g]enerally speaking . . . courts may not turn to the statutory law of alimony to interpret an agreement unless they are invited to do so"). Therefore, we must

- 12 -

determine whether the trial court found that Husband had "a substantial change in his salary and/or his economic position provided such [was] not caused by his own actions." MSA, 6/12/20, at ¶ 3.

Nevertheless, we find instructive that, in cases applying Section 3701(e), this Court has repeatedly affirmed that a modification in alimony is warranted when the payor sustains a significant reduction in income. For example, in *Lee v. Lee*, 507 A.2d 862 (Pa. Super. 1986), we held that the trial court erred by not considering a party's forced, early retirement as changed financial circumstances justifying a reduction in alimony. *See id*. at 865; *see also Speaker v. Speaker*, 183 A.3d 411, 415 (Pa. Super. 2018) (stating that "[t]his Court has continually held that changed financial circumstances resulting from retirement can serve as a basis for a substantial and continuing change necessary to modify an alimony award"); *McFadden v. McFadden*, 563 A.2d 180, 183 (Pa. Super. 1989) (holding that trial court abused its discretion by not considering party's changed financial circumstances brought about by voluntary retirement).

Wife argues that the trial court erred and abused its discretion when it reduced Husband's alimony payments "since the record shows that his salary actually increased in 2023." Wife's Brief at 16. Wife asserts that the court improperly only considered Husband's 2023 income from the Hospital of $266,346.85, while ignoring the $106,932.63 he earned in salary from the Foundation in 2023. Wife contends that, if the court had compared his total income for 2023 of $373,279.48 to his 2022 Hospital income of $365,735.41,

"it would have shown his salary actually increased by more than $7,544.00 which is more than a 2% increase." *Id*. at 18.

Wife further argues that modification of Husband's alimony payments was inappropriate because any change in his "economic position [was] a direct result of his choice to pay expenses he [was] not required or legally obligated to pay." *Id*. at 23. Wife cites numerous expenses Husband has voluntarily assumed the obligation to pay, including: a cellular phone plan for his current wife and stepson; the mortgage and insurance on the home he lives in, which is owned by his mother-in-law; his wife's credit card bills; the lease for his current wife's vehicle; his stepdaughter's rent for her college apartment; and his wife's college tuition. Wife contends that Husband also double-counted certain expenses, such as groceries and gasoline, which he listed as separate monthly expenses and also included within his credit card expense. In light of the fact that the MSA prohibits consideration of any change that Husband himself caused, Wife argues that the trial court had no reason to modify alimony on the basis that his economic position changed. *See* MSA, 6/12/20, at ¶ 3 (prohibiting a reduction in Husband's alimony payments where the change in his salary or economic condition was "caused by his own actions").

The trial court concluded that it was "bound by the principles of contract" and the terms of the "fully negotiated" MSA permitted a reduction in Husband's alimony payments if he showed a substantial reduction in his salary and/or economic position, provided the change was not a result of his own actions. Trial Court Opinion, 9/10/24, at 22. The court determined that

Husband's 2022 and 2023 Hospital W-2 forms were "the relevant financial documents as [Husband's petition] was filed in 2023, therefore contemplating the reductions of income that happened between 2022 and 2023." *Id*. at 19. The court found that Husband's "2022 W-2 subtracted from the 2023 W-2 shows a salary reduction of" $99,388.56. *Id*. at 22. The court thus concluded that Husband met his burden of showing a substantial, involuntary change in salary and awarded a reduction in his alimony payments.

Regarding Wife's arguments that Husband's change in economic position was the result of his own actions, the trial court concluded that the parties contemplated that Husband "would be moving out of the marital home as part of the [MSA] and assuming many of his own expenses such as cellphone, car payments and utilities." *Id*. at 24. Therefore, the court reduced Husband's alimony payments based on his diminished salary alone and "did not consider the additional expenses that [Husband] pays on behalf of his stepchildren and new wife." *Id*.

Based on our review, we conclude that Wife has not shown an error or abuse of discretion in the trial court's decision to grant Husband's petition to modify his alimony obligations. *See Rosiecki*, 231 A.3d at 933. As the court explained, the terms of the MSA governed its analysis of Husband's entitlement to a reduction. *See Long*, 282 A.3d at 698. Pursuant to the MSA, Husband's "alimony payments *shall* be subject to modification if [he] has a substantial change in his salary *and/or* his economic position provided such is not caused by his own actions." MSA, 6/12/20, at ¶ 3 (emphasis added).

- 15 -

Therefore, Husband had the burden to prove that he: (1) had a substantial change in his salary or his economic position; and (2) that he did not cause the change. *See id*. Husband demonstrated that, beginning in June 2023, his salary at the Foundation was $217,500, without the opportunity for bonuses. While Husband's drop in income was not immediate because he received severance from the Hospital for nine months after termination, there is no doubt that Husband's new salary with the Foundation was considerably less than his compensation from the Hospital in prior years. *See Lee*, 507 A.2d at 863, 865 (remanding for trial court to consider Husband's 45% reduction in income due to forced, early retirement as changed financial circumstances meriting a reduction in alimony payments). Additionally, it is undisputed that the reduction in Husband's salary was the result of the Hospital's termination of his employment and not his own actions.

Furthermore, the trial court was within its discretion to "solely focus[] on the diminished salary of" Husband and not consider the evidence presented by the parties concerning their expenses or general economic conditions. Trial Court Opinion, 9/10/24, at 23. The MSA did not indicate that the parties' expenses were a factor in determining alimony and permitted the court to base a modification of alimony on a change to Husband's salary *or* his economic position. *See* MSA, 6/12/20, at ¶ 3. Although we disagree with the trial court's calculation of the reduction in Husband's salary and his new alimony payments, *see infra*, the court properly found that Husband had "a substantial change in his salary . . . not caused by his own actions" and he

was therefore entitled to a reduction in his alimony payments. MSA, 6/12/20, at ¶ 3. No relief is due on Wife's first two issues.

We next address the parties' challenges to the trial court's calculation of the amount of the reduction of Husband's alimony payments, which Husband addresses in his first issue and Wife addresses in her third issue. As noted above, the court reduced Husband's alimony payments from $4,000 per month to $2,908 per month, a 27.3% reduction. In arriving at this figure, the court subtracted Husband's 2023 compensation from the Hospital of $266,346.85 — which included his salary through April 2023 and the severance payments he received for the remainder of the year — from his 2022 total compensation from the Hospital, $365,735.41. The court determined that Husband's income fell by $99,388.56 from 2022 to 2023, which the court found represented a 27.3% reduction.

Husband argues that the trial court abused its discretion in utilizing Husband's 2023 Hospital income for three reasons. First, relying on caselaw addressing the calculation of the marital estate, he contends that the severance payments included within this amount "cannot be considered 'income' for purposes of spousal support." Husband's Brief at 39 (emphasis omitted) (citing *Berry v. Berry*, 898 A.2d 1100 (Pa. Super. 2006), and *Ressler v. Ressler*, 644 A.2d 753 (Pa. Super. 1994)). Second, Husband argues that his 2023 income from the Hospital, did not accurately reflect his post-termination annual salary from the Foundation, which was $217,500. Finally, he argues that the trial court's "absolute[] silen[ce] as to 'why' it

utilized Husband's 2023 W-2" from the Hospital renders the court's determination manifestly unreasonable and requires that this Court vacate the alimony award and remand for a new calculation. Husband's Brief at 40.

Husband asserts that if the trial court had used his new Foundation salary of $217,500 and compared it to his 2022 Hospital income, it would have found a reduction of income of $148,235.41, or 40.5%. In the alternative, he maintains that the court should have used an average of his income for prior years from 2019 to 2022 — but excluding his 2020 compensation because that was "an anomalous year due to the [COVID-19] pandemic" — to find a salary reduction of no more than 34%. *Id*. at 15 n.15, 39.

Wife repeats her argument that Husband's compensation actually increased from 2022 to 2023, when considering his total income 2023 from the Hospital and the Foundation. However, Wife asserts that, even if this Court sanctions the trial court's use of Husband's 2023 Hospital income as his "new" salary, the trial court abused its discretion because it "should have used Husband's 2020 salary [of $294,352] as a measure for determining whether there actually was a substantial change in salary." Wife's Brief at 26. Wife contends that the language of the MSA, as well as the surrounding circumstances at the time of its execution, make clear that the parties intended to use Husband's 2020 compensation as his baseline salary, as "[t]hat was the only 'salary' Husband had at the time the MSA was negotiated." *Id*. at 25. Wife asserts that if the court had calculated the difference between Husband's 2020 and 2023 Hospital compensation, his

income fell by only 9.5%. Therefore, she contends the trial court should have ordered only a 9.5% reduction in Husband's alimony payments.

Upon review, we conclude that the trial court abused its discretion in calculating Husband's new alimony payments. *See Rosiecki*, 231 A.3d at 933. As the parties' arguments illustrate, the court's use of Husband's 2023 Hospital income was manifestly unreasonable as it both undercounted his income for the year by leaving out his 2023 Foundation income and failed to reflect Husband's new, reduced annual salary at the Foundation. *See Stamerro*, 889 A.2d at 1257. As Husband testified at the hearing, his salary at the Foundation "on a go-forward basis [was $]217,500." N.T., 4/12/24, at 38. Because the trial court ordered the reduction in alimony prospectively from the date of entry of its June 13, 2024 order, there was no basis for the court to use Husband's 2023 Hospital income for the purpose of calculating his salary reduction.[4] Therefore, we are constrained to vacate the trial court's calculation of Husband's new alimony payments.

_____

[4] We disagree with Husband's argument that a trial court may not consider severance payments when calculating alimony, as the cases on which he relies relate to the distinct issue of whether severance constitutes income or marital assets when calculating spousal support. *See Berry*, 898 A.2d at 1105-06; *see also Ressler*, 644 A.2d at 755-56. Here, the MSA does not bar consideration of severance in assessing whether a modification of alimony is appropriate, and the court may have considered Husband's severance payments to the extent it led to a substantial change in his economic position. In any event, as noted above, consideration of Husband's severance was inappropriate in light of the fact that the court did not order the alimony modification retroactively.

The MSA is silent as to what salary the trial court should use as a benchmark for calculating the salary reduction, and we find no abuse of discretion in the court's use of Husband's 2022 compensation from the Hospital to represent his "current income." Trial Court Opinion, 9/10/24, at 19. However, the MSA does not require the use of Husband's income from the year prior to the filing of his petition to modify, and the court could have instead considered his income from the time the parties entered into the MSA, as the parties separately argue in their briefs. Indeed, in this case, the court would be within its discretion to utilize an average of Husband's income from 2019 through 2022 since Husband's compensation from the Hospital "vacillated" significantly from year-to-year based upon cost-of-living adjustments and bonuses. N.T., 4/12/24, at 38.[5] Accordingly, we remand with instructions for the trial court to perform a new calculation of Husband's modified alimony based on his reduced salary of $217,500.

Husband further argues in his first issue that the trial court abused its discretion by not reducing his alimony payments retroactively to December 19, 2023, the date he filed his petition. Pursuant to Section 3701(e) of the Divorce Code, when the trial court enters an order modifying or terminating

_____

[5] While Husband claims that the court may not consider his income from 2020 due to the COVID-19 pandemic, there is no basis for such an exclusion in the MSA. Indeed, the parties negotiated, executed, and filed the MSA during the pandemic, and therefore would have had every reason to indicate in the agreement that Husband's 2020 compensation was irrelevant to his alimony obligations if they had wanted to do so.

an alimony award, the "order shall apply only to payments accruing subsequent to the petition for the requested relief."  23 Pa.C.S.A. § 3701(e).  This Court has held that this provision "does not mandate any retroactive payments to the date of filing [of the petition to modify], and only permits the trial court, in its discretion, to apply the modification order to any date subsequent to the date of filing."  *Crocker-Fasulo v. Fasulo*, 292 A.3d 591, 599 (Pa. Super. 2023).

Husband acknowledges our precedent establishing the trial court's discretion to determine the effective date for a modification of an alimony award.  Nevertheless, he argues that delaying his alimony reduction until June 13, 2024, the date of the court's order, was manifestly unreasonable as the court was "silent on *why* it decided not to apply Husband's reduction retroactively."  Husband's Brief at 41 (emphasis in original).

In explaining its rationale for not applying the reduction in alimony retroactively to the date Husband filed his modification petition, the trial court noted that its decision was consistent with our caselaw interpreting Section 3701(e).  The court further stated that a prospective modification from the date of the court's June 13, 2024 order was consistent "with the relevant facts of the instant case."  Trial Court Opinion, 9/10/24, at 25.

Based on our review, we find that the trial court did not abuse its discretion by reducing Husband's alimony prospectively from the date of its order.  *See Rosiecki*, 231 A.3d at 933.  The MSA does not indicate what date the court should choose when reducing alimony following a change in salary

or economic position. Furthermore, our cases under Section 3701(e) afford trial courts broad discretion in determining the appropriate date for a reduction of alimony, so long as the selected date is subsequent to the filing of the petition. **See Crocker-Fasulo**, 292 A.3d at 599. Moreover, applying the reduction in alimony retroactively to the date Husband filed his petition would be inappropriate as he continued to receive severance from the Hospital — in addition to his salary at the Foundation — for at least two months beyond that date. Accordingly, no relief is due on this claim.

In Husband's second issue, he challenges the trial court's finding that he was in civil contempt of the MSA. As reflected above, the court based its contempt ruling on Husband's failure to comply with the MSA's requirements that he: (1) transfer his Pension Plan to Wife; (2) transfer the parties' joint E*Trade Account to Wife's exclusive property; and (3) maintain a life insurance policy that would guarantee Wife's receipt of the total amount of alimony payments until she reached age sixty-six. **See** MSA, 6/12/20, at ¶¶ 2.4, 2.5, 4. The court imposed a suspended sentence of six months' incarceration and a $1,000 fine and provided that he could purge the contempt if he effectuated the transfers of the Pension Plan and E*Trade Account, obtained an adequate life insurance policy, and released all alimony funds paid into escrow since February 2024.

Our scope of review when considering an appeal from a civil contempt finding is narrow, and we will reverse only upon a showing of an abuse of discretion. **See Childress v. Bogosian**, 12 A.3d 448, 465 (Pa. Super. 2011).

A trial court has the authority to find a party in contempt of a private settlement agreement even where the agreement is not merged or incorporated into the divorce decree. **See Zabrosky v. Smithbower-Zabrosky**, 273 A.3d 1108, 1115 (Pa. Super. 2022); **see also** 23 Pa.C.S.A. § 3502(e)(9) (providing that "[i]f, at any time, a party has failed to comply with . . . the terms of an agreement as entered into between the parties, after hearing, the court may . . . find the party in contempt").

To establish that a party is in civil contempt, the complaining party must prove, by a preponderance of the evidence, that: (1) the contemnor had notice of the specific order that he allegedly disobeyed; (2) the act that constituted the contemnor's violation was volitional; and (3) the contemnor acted with wrongful intent. **See Cunningham v. Cunningham**, 182 A.3d 464, 471 (Pa. Super. 2018). "[W]rongful intent can be imputed to a defendant by virtue of the substantial certainty that his actions will violate the court order" or where "the evidence shows that the contemnor knowingly failed to comply." **Jordan v. Pennsylvania State Univ.**, 276 A.3d 751, 767 (Pa. Super. 2022) (citations omitted). A trial court may "set conditions for purging the contempt and effecting release from imprisonment" when "it is convinced beyond a reasonable doubt, from the totality of the evidence before it, the contemnor has the present ability to comply" with the purge conditions. **Childress**, 12 A.3d at 465 (citation omitted).

Husband argues that Wife failed to prove he acted with wrongful intent where he was substantially compliant with the terms of the MSA and Wife

never raised the alleged deficiencies prior to the filing of her contempt petition. Husband avers that "he twice provided to Wife the completed transfer paperwork necessary to vest sole ownership of the E*Trade" Account with her. Husband's Brief at 45. He maintains that Wife failed to introduce "any verifiable evidence" to demonstrate that E*Trade required him to submit the form directly and the court relied solely on Wife's "hearsay testimony" that he did not comply with the MSA. *Id*. Husband asserts that the evidence demonstrates that the parties effectuated the transfers of the Pension Plan through the filing of a QDRO on April 1, 2022. He avers that "there is nothing else to be done regarding [Paragraph] 2.4 of the MSA" and "Wife provided zero testimonial or documentary evidence that Husband failed" to comply with this provision. *Id*. at 46-47. Finally, Husband asserts that he "procured the requisite life insurance" guaranteeing his total alimony obligation to Wife. *Id*.

The trial court found that Wife met her burden of establishing that Husband was in civil contempt of the MSA based on his failure to comply with the terms of that agreement. Concerning the Pension Plan, the court observed that Husband stated that he executed the QDRO and related documents to transfer the Plan but found the record lacked evidence of a completed transfer. The court found that Husband's testimony demonstrated that he failed to take sufficient steps to transfer the E*Trade Account because he failed to submit the form directly. In addition, the court noted that Husband introduced a blank E*Trade transfer form at the hearing. Finally, the court observed that Husband acknowledged the requirement that he is to maintain a life insurance

policy to guarantee Wife's receipt of alimony through age sixty-six, yet he failed to maintain the policy.

After careful review, we conclude that the trial court abused its discretion by finding Husband in contempt based on his alleged failure to transfer the Pension Plan but otherwise affirm the court's contempt ruling. *See Childress*, 12 A.3d at 465. With respect to the Pension Plan, Husband submitted at the hearing the QDRO establishing Wife's right to receive benefits from the Plan, which was filed with the trial court on April 1, 2022, as well as an executed authorization form permitting Wife to manage the Plan. *See* Husband's Exhibits D, E. In addition, he testified that he filed and executed all the relevant documents pertaining to the Pension Plan and had no notice that he was not in compliance with his obligations under Paragraph 2.4 of the MSA. *See* N.T., 4/12/24, at 16-19. Wife presented no evidence or testimony concerning the Pension Plan at the hearing. In light of the absence of any proof of Husband's non-compliance with his obligations related to the Pension Plan, we find that Wife did not meet her burden of demonstrating that Husband was in contempt of Paragraph 2.4 of the MSA.

However, we determine that Wife met her burden with respect to the remainder of the trial court's contempt ruling. There is no dispute that Husband had notice of the relevant provisions of the MSA, as he executed the agreement and filed it with the trial court in 2020 and otherwise complied with its terms over the ensuing years. *See Cunningham*, 182 A.3d at 471. Moreover, the evidence at the hearings established that Husband's violations

of the relevant MSA terms were knowing and volitional. *See id*.; *see also Jordan*, 276 A.3d at 767. Husband testified that he maintained a life insurance policy during his employment with the Hospital that was sufficient to guarantee the full amount of his alimony obligation to Wife. *See* N.T., 4/12/24, at 14-15, 30-31. However, this policy expired upon the termination of his employment at the Hospital, and his new policy through the Foundation provided only $100,000 of coverage. *See id*. at 31-34. Husband admitted that his current policy would not cover his remaining alimony obligation to Wife, even if the trial court reduced his payments by 50% as he requested. *See id*. at 35, 71, 75-76. The court thus properly found Husband in contempt based on his failure to maintain a life insurance policy sufficient to guarantee his alimony payments to Wife until she reached age sixty-six.

With respect to the E*Trade Account, Wife testified that E*Trade informed her on the date of the hearing that Husband's name remained on the account and they had not received the required paperwork from Husband to place the account solely in her name. *See id*. at 97-99, 110-11. Wife explained that Husband had to submit the transfer form directly to E*Trade and she could not submit it for him. *See id*. at 98-99, 111. Husband admitted that Wife had provided the transfer form to him in the past, and he stated that he executed the form and returned it to Wife on at least two occasions. *See id*. at 21-22, 36, 70. However, Husband did not testify that he sent the transfer form directly to E*Trade, and the form he submitted at the hearing to demonstrate his compliance with his obligation under the MSA was blank.

*See* Husband's Exhibit F. We discern no abuse of discretion in the trial court's resolution of the conflicting testimony regarding the E*Trade Account in Wife's favor and finding that Husband failed to undertake the necessary steps to transfer the account. *See Rosiecki*, 231 A.3d at 933.

Accordingly, we vacate the court's finding that Husband was in contempt of Paragraph 2.4 of the MSA relating to the transfer of the Pension Plan to Wife and the purge condition requiring him to effectuate the transfer of the Plan within thirty days of the date of the order. We affirm the trial court's finding that Husband was in contempt of Paragraphs 2.5 and 4 of the MSA on the basis that he failed to maintain a life insurance policy to guarantee the alimony payments and transfer the E*Trade Account to Wife. As Husband does not argue that he lacks "the present ability to comply" with the purge conditions imposed by the trial court, we affirm the remaining purge conditions. *Childress*, 12 A.3d at 465 (citation omitted).[6]

---

[6] One of the purge conditions imposed by the trial court — requiring Husband to release all alimony payments to Wife held in escrow — was unrelated to the court's contempt findings. Nevertheless, we observe that Husband conceded at the hearing that he began paying half of his monthly escrow payments — $2,000 per month — into an escrow fund in February 2024. *See* N.T., 4/12/24, at 40, 73-74. Furthermore, Husband stated that he "would [not] have any problem" releasing the escrow funds to Wife if the court denied his petition to modify. *Id*. at 74. Because Husband has the present ability to comply with the condition that he release the alimony held in escrow and he has not challenged the trial court's inclusion of a purge condition unrelated to its contempt ruling, we see no basis to disturb the court's inclusion of this condition.

In light of our ruling vacating the calculation of Husband's modification of alimony, we remand for further proceedings consistent with this decision.

Order affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/05/2025